# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DONNA GARCIA, a Washington resident; ) 
CONCEPCION GARCIA, an individual; )      No. 70395-1-I
and PATRICIA JANE LEIKAM, as the )
administrator of the estate of Tiairra )      DIVISION ONE
Garcia, a deceased person, )
) UNPUBLISHED OPINION
                    Appellants, )
)
          v. )
)
JOEY'S 1983, INC., a Washington )
corporation; MARNICUS ANTONIO )
LOCKHARD, a Washington resident; )
ASHONE HOLLINQUEST, a Washington )
resident; "JOHN DOE" 1-10; and )
)
                    Defendants, )
)
CITY OF PASCO, WASHINGTON, a )
municipal city, )
)
                    Respondent. )      FILED: March 24, 2014
)

APPELWICK, J. — Garcia[1] appeals the trial court's grant of summary judgment dismissing her negligence claim against the City. Garcia argues that the public duty doctrine did not bar her claim, because the rescue exception applied. She further contends that Pasco had a duty under Restatement (Second) of Torts § 302B (1965) to protect her daughter from the criminal acts of a third party. We affirm.

---

[1] Donna Garcia is joined in the suit by her daughter, Concepcion Garcia, and Patricia Jane Leikam, the administrator of Tiairra's estate. For the sake of clarity, we refer to the appellants simply as "Garcia."

FACTS

On June 22, 2008, Tiairra Garcia drove Marnicus Lockhard and Ashone Hollinquest to a tavern in Pasco. In the parking lot, Lockhard reached for a gun Hollinquest was holding. The gun discharged and struck Tiairra.[2]

Lockhard panicked and took control of the van. Instead of taking Tiairra to the hospital, he drove to the home of a woman referred to as "Granny." Lockhard drove erratically, striking a number of cars before parking on the lawn. This alerted several neighbors who called 911. Police were dispatched to the scene.

One of the neighbors who called 911 was John Gorton. While Gorton was on the phone, Lockhard and Hollinquest pulled Tiairra's body out of the van and around to the back of the house. Gorton relayed this information to the operator. Gorton told the operator the police had arrived. The operator replied, "Okay. The police are there now," and took down Gorton's name.

The police questioned Granny about the vehicle collisions and arranged to have the van towed. They did not investigate the allegation that a body had been dragged into the house. Tiairra lay unconscious in a room inside, where she ultimately died.

Tiairra's mother, Donna Garcia, sued the City of Pasco (City) for negligent performance of its duties. The trial court granted summary judgment, finding that the public duty doctrine barred Garcia's claim. Garcia appeals.

DISCUSSION

Garcia asserts that the public duty doctrine does not bar her claim. She maintains that the rescue exception to that doctrine applies, because the City assumed

---

[2] We use Tiairra's first name to avoid confusion, but intend no disrespect.

2

the duty to aid Tiairra. She further argues that summary judgment was improper, because the police had a duty to protect Tiairra under the Restatement § 302B.

This court reviews a trial court's summary judgment order de novo. Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wn.2d 168, 177, 125 P.3d 119 (2005). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id. This court construes the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Id.

I.  Public Duty Doctrine: Rescue Exception

Garcia argues that her claim should have survived summary judgment, because the rescue exception to the public duty doctrine applies here. Under the public duty doctrine, a government actor is not liable for injuries caused by his or her negligent conduct, unless that conduct breached a duty to the injured person as an individual, rather than the actor's duty to the general public. Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001). There are four exceptions to this doctrine, including the rescue exception. Id. at 785-86.

The rescue exception applies where a government actor (1) assumes the duty to aid or warn a person in danger; (2) fails to exercise reasonable care; (3) offers to render aid; and (4) in doing so, causes either the person to whom the aid is to be rendered, or another acting on that person's behalf, to refrain from acting on the victim's behalf. Vergeson v. Kitsap County, 145 Wn. App. 526, 539, 186 P.3d 1140 (2008).

A public official's routine responses will not give rise to an enforceable promise of protection. See Torres v. City of Anacortes, 97 Wn. App. 64, 76, 981 P.2d 891 (1999). In public duty doctrine cases involving 911 calls, Washington courts have found that a

3

duty was owed to the victim where the operator made an express assurance that help would be provided, but it was not. See, e.g., Beal v. City of Seattle, 134 Wn.2d 769, 786, 788, 954 P.2d 237 (1998); Chambers-Castanes v. King County, 100 Wn.2d 275, 279-81, 669 P.2d 451 (1983). In Beal, the victim called 911 for a civil standby so she could pick up her belongings from her estranged husband. 134 Wn.2d at 773. The operator told the victim that "'we're going to send somebody there'" and "'[w]e'll get the police over there for you okay?'" Id. at 774 (alteration in original). Twenty minutes later, the victim's husband shot and killed her while she waited for the police. Id. No officer had been dispatched by that point. Id. In Chambers-Castanes, a woman called 911 multiple times to report an ongoing assault. 100 Wn.2d at 279-80. During each call, the operator assured that help would be provided, stating, "'All right, we'll get somebody up there then'"; "'We have the officer; he is on the way'"; and that the police "'are almost there now. In fact they are probably there.'" Id. Police were not dispatched until the woman called a third time, roughly 30 minutes after the original call. Id.

No express assurance was made in the present case. The following is a transcript of the call between Gorton and the 911 operator:

> *911 Operator:* 911.
> *John Gorton:* Yeah, I live across the street from 1611 Parkview and there's something going on over there. There's smoke coming out from a van on the north side of the house.
> *911 Operator:* Okay, and what's the address there?
> *John Gorton:* 1611 Parkview.
> *911 Operator:* 1611 Parkview.
> *John Gorton:* Yeah, and there's been a little - ah - I think it's like a Chevy Luv or small pickup - Chevy S10 - that's driven by like seven -
> *911 Operator:* And is that the address of the house?
> *John Gorton:* Yes. It's driven by like seven or eight times.
> *911 Operator:* Where's the smoke coming from?

*John Gorton*: It's coming from the north side of the house. I don't know if it look[s] likes [sic] it's outside of the house.
*911 Operator*: Okay, and do you see any flames?
*John Gorton*: No. No flames. Just smoke. They pulled somebody out of a van in the back of the house and dr[a]gged them to the back of the house.
*911 Operator*: So you don't know if it's a car or it's the house or -?
*John Gorton*: I - don't know. The smoke is - smoke is gone now.
*911 Operator*: So the smoke is gone?
*John Gorton*: Yeah. There's - there's something going on over there. You need to get somebody over here.
*911 Operator*: Okay. And do you think it's a fire or -?
*John Gorton*: No. It's not a fire. There's been something going on all weekend over here. There was a huge domestic fight yest - last night.
*Voice in background*: Yep. Cop car's already there.
*John Gorton*: Okay. Police are here now.
*911 Operator*: Okay. The police are there now.
*John Gorton*: Yeah.
*911 Operator*: Okay. What's your name?
*John Gorton*: John Gorton.
*911 Operator*: John Gorton. And did you guys call already?
*John Gorton*: No. We didn't.
*911 Operator*: Okay. Thank you.
*John Gorton*: Uh huh.
*911 Operator*: Bye. Bye.

The operator repeatedly said, "okay" and took down Gorton's name, but made no statements about a police response to Gorton's observations. No affirmative promise was made. This does not amount to an assumption of the duty to aid or warn Tiairra.

Garcia does not demonstrate that the City affirmatively assumed a duty to aid or warn Tiairra. Instead, she argues that the 911 operator made an implicit promise to convey Gorton's statement to the police and that the police would then investigate. She cites no authority for this assertion, and Washington case law does not support it.

Even if the 911 operator promised to relay Gorton's statement to the police, that would have been within the scope of her duty to the general public—not a gratuitous promise. And, to trigger liability under the rescue exception, the government actor's

5

assumption of the duty to aid or warn must be gratuitous. Babcock v. Mason County Fire Dist. No. 6, 101 Wn. App. 677, 685, 5 P.3d 750 (2000), aff'd on other grounds, 144 Wn.2d 774, 30 P.3d 1261 (2001). While the Babcock court called this aspect "integral," it did not define gratuitous. See id. However, it found that when a fire district assumes the duty of fighting a fire, it does not do so gratuitously. Id. at 686. The court reasoned that the district was established for "this very purpose—to fight fires and to protect the property of all citizens." Id. (emphasis in original).

Like a fire district responding to a fire, the very purpose of a 911 dispatch is to receive emergency calls and relay information to the police. See Johnson v. State, 164 Wn. App. 740, 752, 265 P.3d 199 (2011), review denied, 178 Wn.2d 1027, 273 P.3d 982 (2012). In Johnson, a man called 911 to report a car driving erratically in front of him. Id. at 745. The 911 operator transferred him to the Washington State Patrol, who told the man that it would notify troopers. Id. When the erratic driver exited the highway, the caller did not follow her and continued along the highway. Id. The erratic driver was later found dead. Id. Her widower brought suit, arguing that the State caused the 911 caller to refrain from aiding his late wife. Id. at 751. The court found that the State did not make a gratuitous offer to render aid, because its actions were "made as part of its duty to 'all citizens.'" Id. (quoting Babcock, 101 Wn. App. at 686).

Here, the 911 operator did nothing more than her duty to all citizens: responding to and relaying calls. This was not a gratuitous promise to an individual necessary to trigger the rescue exception. The trial court did not err in granting summary judgment dismissing Garcia's claims on the basis of the public duty doctrine.

## II.   Restatement (Second) of Torts § 302B

Garcia argues that the police had a duty to protect Tiairra under the Restatement § 302B.  Section 302B provides that "[a]n act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."   More specifically, the provision imposes a limited duty to protect third parties where an actor's own affirmative act creates a recognizable and unreasonable risk of harm.  Robb v. City of Seattle, 176 Wn.2d 427, 433-34, 295 P.3d 212 (2013).   Garcia contends that § 302B creates a duty here, because the police affirmatively indicated that they would investigate Gorton's statement about Tiairra's body and failed to do so.

As a threshold matter, the City argues that Garcia should not be allowed to raise this argument for the first time on appeal.   This court may refuse to review any assignment of error that was not first raised in the trial court.  RAP 2.5(a).  An exception applies when, while the appeal is pending, a new issue arises because of a change in law.  Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 441, 191 P.3d 879 (2008).  Garcia maintains that a change in law occurred after the trial court dismissed her claim.  She cites to Robb v. City of Seattle, where this court held that a government actor—like a private actor—can owe a duty under § 302B.  159 Wn. App. 133, 145, 245 P.3d 242 (2010). reversed by, 176 Wn.2d 427.  Garcia argues that this constituted a significant change in public duty doctrine jurisprudence.  While the Court of Appeals decision may have represented a significant change in the law, the Washington Supreme Court

subsequently reversed the outcome of the appellate decision in Robb. 176 Wn.2d at 439-40.

In Robb, the court found that the officers' failure to act did not create a duty under § 302B. Id. at 437-38. There, two officers stopped a man named Samson Berhe on suspicion of burglary. Id. at 430. During their stop, the officers observed several shotgun shells on the ground near Berhe, but did not question him about them or pick them up. Id. Because they did not have probable cause to hold Berhe, the officers released him. Id. Less than two hours later, Berhe shot and killed Michael Robb, likely with the same shells. See id.

Robb's widow sued the city, arguing that the officers breached their duty under § 302B. Id. at 429. The court recognized that § 302B may create a duty to certain third parties, but emphasized that this duty arises out of only affirmative acts, rather than omissions. Id. at 433, 436-37. It explained that an affirmative act—or misfeasance—entails the creation of a new risk to the plaintiff. Id. at 437. By contrast, an omission—or nonfeasance—consists of passive inaction or failure to protect others from harm. Id. The court found that the officers' failure to pick up the shells (and thereby prevent Behre from shooting Robb) was an omission, not an affirmative act. Id. at 437-38.

By contrast, in Parrilla v. King County, 138 Wn. App. 427, 440-41, 157 P.3d 879 (2007), a government actor's affirmative act led to liability. There, a bus driver exited his bus with the engine still running, leaving a visibly erratic passenger inside. Id. at 431. The passenger took control of the bus and crashed into a car. Id. The court found that the bus driver committed an affirmative act that gave rise to a duty of care to occupants of the car under § 302B. Id. at 440-41.

Here, there was no affirmative act. The record does not demonstrate that the police promised to investigate Gorton's statement or were even aware of it. The 911 operator did not indicate that the police would take any particular action and did not acknowledge Gorton's statement about a body, other than to respond, "Okay." This does not constitute an affirmative indication that the police would investigate Gorton's statement.

This leaves the police's failure to investigate as the remaining potential source of a duty to Tiairra. But, their failure to investigate was an omission. Like the officers in Robb, the police did not create a new risk. Instead, they failed to reduce an already-existing risk: Tiairra's injuries from the gunshot. Conversely, the driver in Parrilla increased the risk to nearby drivers through his affirmative act of leaving the bus running with an erratic passenger inside. 138 Wn. App. at 438. Here, the officers' failure to investigate was nonfeasance, which does not give rise to liability under § 302B.

The City did not have a duty to Tiairra under either the rescue exception to the public duty doctrine or Restatement (Second) of Torts § 302B. The trial court properly granted summary judgment dismissing Garcia's negligence claims. We affirm.

_Appelwick, J._

WE CONCUR:

_Verellen, J._                    _Cox, J._

9